UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY DAME,

                     CIVIL ACTION NO. 2:16-CV-10043
        *Plaintiff*,          DISTRICT JUDGE DAVID M. LAWSON
*v.*                      MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 14)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Dame is not disabled. Accordingly, **IT IS RECOMMENDED** that Dame's Motion for Summary Judgment (Doc. 13) be **DENIED**, the Commissioner's Motion (Doc. 14) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 2). The

matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 14).

On June 17, 2013, Plaintiff Sherry Dame filed an application for DIB, alleging a disability onset date of January 1, 2013. (Tr. 158-59). The Commissioner denied her claim. (Tr. 78-82). Dame then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on May 18, 2015, before ALJ Andrew Sloss. (Tr. 53-84). At the hearing, Dame—represented by her attorney, Deanna Lee-Kaniowski—testified, alongside Vocational Expert ("VE") Ms. Everts. (*Id.*). The ALJ's written decision, issued May 22, 2015, found Dame not disabled. (Tr. 12-24). On November 5, 2015, the Appeals Council denied review, (Tr. 1-6), and Dame filed for judicial review of that final decision on January 6, 2016. (Doc. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R.

404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Dame not disabled under the Act. (Tr. 12-29). At Step One, the ALJ found that Dame had not engaged in substantial gainful activity during the period from her alleged onset date of January 1, 2013, through her date last insured of December 31, 2013. (Tr. 17). At Step Two, the ALJ concluded that the following impairments qualified as severe: "degenerative disc disease, carpal tunnel syndrome, and obesity." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 18-19). Thereafter, the ALJ found that Dame had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [T]he claimant can frequently climb ramps or stairs. The claimant must avoid concentrated exposure to vibration.

(Tr. 19). At Step Four, the ALJ found Dame "able to perform [her past work as a cashier] as generally performed." (Tr. 23). In light of this finding, the ALJ did not proceed to Step Five, and deemed Dame not disabled. (Tr. 23-24).

### E. Administrative Record

#### 1. Medical Evidence

In 1988, Dame sought surgery in both hands for her carpel tunnel syndrome, but over the years "I've just started having more pain, and my hands go to sleep more." (Tr. 37). Neurologist Dr. Banghu reported difficulty with pushing, pulling, and lifting in August 2012. (Tr. 500). An EMG at that time revealed bilateral, mild median neuropathy at the wrist, consistent with bilateral carpal tunnel syndrome; Dame was advised to wear wrist splints and avoid repetitive hand or wrist movements. (Tr. 500-501). A post-DLI EMG from April 30, 2015, also revealed median nerve compromise at the wrists, compatible with carpal tunnel syndrome, "borderline in severity." (Tr. 538).

Dame's back issues have persisted for approximately thirty years, and she believes they "stem from an incident when she was kicked in the back." (Tr. 370). In October 2008, a back examination at Genesys Regional Medical Center found mild spondylosis of the lumbar spine. (Tr. 359). X-rays taken at Greater Flint Imaging in June 2011, under the care of Dr. Mohamed, revealed signs of low back pain—"a unilateral right sacralization of L5" in particular." (Tr. 283). The same visit showed "[h]ypertrophic degenerative changes from C3 to C7 with degenerative disc changes" in the cervical spine. (Tr. 287). Shortly thereafter, Dame visited the hospital after being involved in a car accident, complaining of "some tingling and numbness in the left upper arm." (Tr. 261).

At this time, Dame also sought medical treatment from Dr. Dolven. In August 2013, his reports ring similarly to those discussed above: "The patient presents with complaints of gradual onset of intermittent episodes of mild back stiffness. . . . Symptoms are improving." (Tr. 404). Physical examinations tended to confirm "bilateral muscle spasms, left-sided muscle spasms, and right-sided muscle spasms." (Tr. 405).

In July 2014, Dame had a surgical procedure involving "[r]ight sacroiliac joint injection using fluoroscopic guidance," which indicated "[l]umbar spondylosis, low back pain, [and] sacroiliac pain." (Tr. 361). Shortly before this procedure, she had begun to attend physical therapy, complaining of pain at "7" on a scale from one to ten. (Tr. 486). After seven visits, her physical therapist recounted that "[s]he does not think it has helped much. With anything, the pain seems to be a little worse," but now is "more focused on the left side" and "localized to the low back." (Tr. 365). Of note, however, she denied "any numbness, tingling, or weakness" as well as "any changes in her bowel or bladder habits." (*Id.*). A subsequent physical examination uncovered "some discomfort to palpation over bilateral sacroiliac region. . . . Minimal pain over bilateral lower lumbar paravertebral muscles. . . . [G]ood range of motion with lumbar flexion and extension. [And] [i]ncreased pain with extension." (Tr. 371). Her gait was "normal-based and fluid," and she could "perform squat without pain or difficulty." (*Id.*). The report also noted "normal strength and sensation in her lower limbs." (*Id.*).

A history of chest pain also surfaces in the medical records. In treatment notes from Dr. Mohamed in February 2012, for instance, Dame complained of chest pain, though a physical exam revealed nothing definitive. (Tr. 259). A similar visit to the Cardiology Institute of Michigan that same month, and the month after, uncovered nothing in particular. (Tr. 291-93, 298-300).

In September 2013, Dr. Nims performed a physical examination. It showed "[l]ow back pain" with "radiation to the feet." (Tr. 351). Interestingly, Dame "denie[d] [a] history of chest pain. . . . asthma. . . . any hospitalization for respiratory problems. . . . [and] use of

inhalers." (*Id.*). Her grip strength presented as normal. (Tr. 353). Dr. Nims found "no evidence of paravertebral muscle spasm. . . . Straight leg raise test in the sitting and supine position is normal. . . . able to stand on one leg at a time without difficulty." (*Id.*). He also found "no hip joint tenderness, redness, warmth, swelling or crepitus." (*Id.*). His ultimate impression included the following entries: "Chronic low back pain with radiation to the feet apparently secondary to degenerative joint disease. Chronic neck pain with radiation to the left arm secondary to degenerative joint disease. Hypertension. Chronic bronchitis. Status post bilateral carpal tunnel release. [And a] [h]istory of spousal abuse." (Tr. 354). As such, her "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects is moderately impaired . . . ." (*Id.*). In addition, the "lower extremity range of motion is limited somewhat by chronic low back pain which affects the claimant's ability to walk and stand for prolonged periods of time." (*Id.*). However, he also notes that the "claimant is independent with her tasks of daily living" and "does seem capable of non-strenuous tasks performed without excessive walking or standing." (*Id.*).

A report signed by Dr. Giacalone and N.P. Holloway from May 2015 noted "lumbar denervation" causing "chronic back pain." (Tr. 545). This, in their opinion, affected sitting such that Dame "[m]ust be allowed to change positions." (Tr. 547). She was capable of sitting for two hours total, and sixty minutes without interruptions; further, she would need five to fifteen minute unplanned breaks daily (perhaps every hour). (*Id.*). She was likely to be absent more than four days per month. (*Id.*). Due to these conditions, she could never climb ladders, and rarely: look down, turn her head, look up, hold her head in static

position, twist, stoop, bend, crouch or squat, or climb stairs. (*Id.*). These symptoms would "[c]onstantly" interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 548).

Other miscellaneous conditions plague Dame as well, though underrepresented in the medical records. In December 2011, for instance, Dame visited Medical Coverage Services because she was "coughing very bad at night and is having trouble sleeping." (Tr. 263). Impressions including an abnormal electrocardiogram, acute peptic ulcer, benign hypertension, esophageal reflux, obesity, precordial pain, and shortness of breath were recorded after a May 2013 examination by the Cardiology Institute of Michigan. (Tr. 331).

## 2.  Application Reports and Administrative Hearing

### a   Function Report

Dame completed a function report on September 4, 2013. She complained of "c[h]ronic pain in my lower back and legs" and "left arm" when "I stand for long periods of time or do a lot of bending or lifting." (Tr. 217). Her daily activities included "light house work," attending college classes twice a week, resting between chores, and watching television. (Tr. 218). She noted that she had trouble doing buttons at times while dressing, that her hands caused her to drop her hairbrush, and that she used her husband's shower chair due to difficulty standing up. (*Id.*). Though able to wash dishes for "a few minutes," she would rest frequently. (Tr. 219). When cooking, she encountered difficulty in "peal[ing] things." (*Id.*). Limited as Dame was, her daughter "does the heavy lifting and cares for my husband." (Tr. 218). Her son also came to "take[] care of my yard." (Tr. 219).

But she also cared for her husband by "cooking" and helping him bathe and dress. (Tr. 218).

Before the onset of her conditions, Dame "worked as a cashier" and "was able to take walks, play games such as volley ball" and wash dishes "while standing." (Tr. 218). At the time of the hearing, though, she awoke once or twice each night to "take pain medication for my legs and back." (*Id.*). Food preparation involved cooking "a lot of frozen foods or foods that are quick to prepare," and took half-an-hour to an hour daily. (Tr. 219). Twice a month she shopped for groceries, and could drive herself to the store. (Tr. 220). She also had no difficulty paying bills, counting change, handling a savings account, or using a checkbook or money orders. (*Id.*). She regularly attended church, college classes, and doctor's appointments for her husband. (Tr. 221).

As hobbies, Dame enjoyed "playing the guitar, watching tv, [and] walking," though she played her guitar "very seldom." (*Id.*). Indeed, her conditions prevented her from walking "because I begin to hurt," and her carpel tunnel interfered with her capacity to play guitar. (*Id.*). And she marked difficulty with: lifting, bending, standing, reaching, walking, kneeling, stair climbing, completing tasks, and using her hands. (Tr. 222). In light of her medical issues, she takes Amlodipine Besylate, Hydrochlorothiazide, Omeprazole, Sucralfate, and Naproxin, though the latter irritated her ulcers. (Tr. 224).

### b   Dame's Testimony at the Administrative Hearing

At her hearing before ALJ Andrew Sloss, Dame confirmed that she had worked nowhere since her alleged onset date of January 1, 2013. (Tr. 33). As a cashier, she lifted "in between 50 pounds on up" while stocking shelves, which she did when not "waiting on

customers"—about half of each day. (Tr. 34). At the hearing, her only source of income was her husband. (*Id.*). Though she "stopped working because my husband became disabled, . . . I probably would have had to quit eventually anyway because I was already having health issues at the time." (*Id.*). When prompted, Dame noted that in fact she "ended up in the hospital" and her doctor "found that I [had] an ulcer, but [no] insurance, and because I didn't have insurance to pay for the hospital bill, the hospital and I discussed it and decided that the best thing to do would be to file for social security." (Tr. 39).

These problems, Dame said, included "carpal tunnel in both my hands," "low-back pain," "problems in my hips," "diabetes," "incontinence where I have to be able to use the bathroom quite often," "diverticulitis," "asthma," and "probably a couple of other things that the doctors have said that I have, but . . . I can't remember." (Tr. 35). Her low-back pain has persisted for ten or fifteen years, but "it's gotten worse." (*Id.*). On a scale of one to ten, Dame described her pain as "an 8 or 9" that day, and "a 7" on a good day. (*Id.*). To alleviate the pain, she attended physical therapy on Mondays, Wednesdays, and Fridays in addition to medication. (Tr. 36). A week before the hearing, her doctor told her that her left hip was "almost to the point of osteoporosis." (Tr. 37). She estimated an ability to walk "maybe a block" and stand "about five minutes without pain." (Tr. 41). "[I]f things keep progressing the way they are now, I'm going to probably have to have the hip replacement, and they said the pain that I have in my back, . . . will probably never go away." (*Id.*).

In 1988, she had surgery on both wrists for her carpal tunnel syndrome. (Tr. 36). Her symptoms returned, and caused pain when picking up "anything too heavy," "cutting vegetables," or holding something too long. (*Id.*). It also caused her fingers to "go to sleep."

(*Id.*). For these reasons, she wore a brace for both hands at night. (Tr. 37). For extended amounts of time, Dame estimated she could carry no more than "five to six pounds"; anything more would cause pain in her shoulders, back, and hands, until she dropped the item. (Tr. 40-41). This problem restricted her since "probably 2011." (Tr. 41).

Dame also noted "diverticulitis" as a condition, though the diagnoses was recent and not in any treatment records. (Tr. 37). As she says, "[t]hey didn't prescribe anything, and I was on an inhaler. I have a cough that comes and goes, and it's, you know, sometimes I can cough. Every single morning I cough for probably an hour, and then it goes away." (*Id.*).

On a typical day, Dame "[m]ostly watch[es] TV." (Tr. 38). If she washed dishes, "I can maybe wash [them] for a couple of minutes and sit down when the pain starts and then get back up and do it again, but it takes me forever. I have my daughter help me." (*Id.*). Her daughter took her to the store, "and I use the Amigos in the store to ride." (*Id.*). On occasion, she visited her sister and went to church. (*Id.*). In any case, due to her incontinence, Dame indicated that she "can control it, but I have to be protected all the time, 24 hours a day." (*Id.*).

### c  The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Dame's ability to perform work. (Tr. 45). Commencing Step Four of her analysis, the ALJ asked the VE if "a person of the Claimant's age, education and past work, is able to perform light work except that she can frequently climb ramps or stairs and must avoid concentrated exposure to vibration, could she perform any of her past work?" (Tr. 46). The VE indicated that such

an individual could not perform such work as performed, but only "as it[']s described in the DOT." (*Id.*). In addition, the VE noted that no jobs will accommodate "a five-minute break every 30 minutes." (*Id.*).

Dame's attorney then asked whether a "hypothetical person . . . limited to hand usage no more than two hours out of an eight-hour day" would "be capable of performing work as a cashier." (*Id.*). Because two hours a day is "less than frequent," and the cashier job "is described a[s] frequent . . . reaching, handling, fingering and feeling," such an individual would not be able to perform the cashier job as described in the DOT. (Tr. 47). This exchange concluded the hearing.

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including

symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2,

1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.

*See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR

96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Dame puts forth three arguments in her motion for summary judgment: (1) That the ALJ erred in assigning little weight to opinions from Dr. Giacalone and N.P. Holloway. (2) That the ALJ performed an improper credibility determination. And (3) that the ALJ erred in finding Dame capable of performing the job of cashier. I address each argument in turn.

### 1. The ALJ Did Not Err in Declining To Accept Opinions from Dame's Treating Physician and Nurse Practitioner

Dame claims error in the weight assigned to Dr. Giacalone's and N.P. Holloway's opinions. She concedes that Dr. Giacalone's treatment notes "indicate [Dame] was primarily seen by [N.P.] Holloway," but nevertheless takes issue with assigning her opinion little weight. (Doc. 13 at 16). In fact, as the ALJ notes, "there is no indication [in the record] that Dr. Giacolone ever treated [Dame]." (Tr. 22). As such, the ALJ apparently treated the opinion as belonging solely to N.P. Holloway. And because Dame makes no serious attempt to rebut this conclusion, this Court need not attempt to do so in her stead. *See, e.g.*, *Jacobsen v. Comm'r of Soc. Sec.*, 2015 WL 5749608, at *4 (W.D. Mich. Sept. 30, 2015) ("It is well accepted that a claimant waives any argument that is not properly or sufficiently developed."); *Martin v. Comm'r of Soc. Sec.*, 2014 WL 902756, at *6 (E.D. Mich. Mar. 7, 2014) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (citation omitted)).

As for N.P. Holloway's opinion, Dame casts the ALJ's opinion as so threadbare it violates SSR 06-03p. She posits that the ALJ did not "specifically reference why he reject[ed] the opinion of [N.P.] Holloway, other than the fact that she is merely a 'nurse practitioner,'" and that he categorically disregarded an opinion from N.P. Holloway

because Dr. Giacalone counter-signed it, without further explanation. (Doc. 13 at 17) (citation omitted). She also claims that the ALJ did not evaluate the factors listed in SSR 06-03p with respect to N.P. Holloway's opinion, and thus "the ALJ misinterpreted the law." (*Id.* at 18-19).

Although the ALJ "generally should explain the weight given to opinions from . . . 'other sources,'" there remains "a distinction between what an adjudicator must consider and what the adjudicator must explain." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). "[T]he SSA requires ALJs to give reasons for only *treating* sources." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). As Dame concedes, N.P. Holloway is not an "acceptable medical source." An ALJ may grant an opinion less weight when from an "other source." *See* SSR 06-03p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006) ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight that an opinion from a medical source who is not an 'acceptable medical source.'"); *see also Dennis v. Comm'r of Soc. Sec.*, No. 13-12754, 2014 WL 4639511, at *21 (E.D. Mich. Sept. 16, 2014) ("The Commissioner and many courts note that 'other sources' are generally given less weight than 'acceptable' sources." (citing *Dunmore v. Colvin*, 940 F.Supp.2d 677, 685 (S.D. Ohio 2013))); *Noe v. Apfel*, 6 F. App'x 587, 587 (9th Cir. 2001) ("Downs is an 'other source' and the ALJ can accord her opinion 'less weight than opinions from acceptable medical sources.'" (quoting *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996))).

Neither must the ALJ proceed methodically down an enumerated list of factors when attributing this or that weight to an "other source" opinion. *See* 20 C.F.R. § 404.

1527(c) ("[W]e *consider* all of the following factors in deciding the weight we give to any medical opinion.") (emphasis added); SSR 06-03p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006) ("Not every factor for weighing opinion evidence will apply in every case. . . . Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case."); *Id.* ("[I]t *may* be appropriate to give more weight to the opinion of [an "other source"] if he or she has . . . provided *better supporting evidence* and a *better explanation* for his or her opinion.") (emphasis added); *cf. Hall v. Comm'r of Soc. Sec.* 148 F. App'x 456, 464 (6th Cir. 2005) ("[I]t is critical that, when reviewing the ALJ's reasoning [with respect to 20 C.F.R. § 404.1527(d)(2)] . . . . [w]e are reviewing the . . . decision to see if it *implicitly* provides sufficient reasons for the rejection of [a medical source statement]." (emphasis added)). Of course, the ALJ cannot make such a decision arbitrarily. *See Sullivan*, 595 F. App'x at 506 (articulating the "substantial evidence" standard). But the ALJ here expressly found that the "objective findings of mild degenerative changes" did not support the "very severe restrictions" N.P. Holloway predicted. (Tr. 22).

The record contains substantial evidence to bolster this finding, which the ALJ includes in his opinion: An evaluation from the consultative examiner, Dr. Nims, showed that Dame "ambulated with a normal gait," "normal range of motion," "5/5 grip strength bilaterally," and the ability to "write with the dominant hand and pick up coins with either hand without difficulty." (Tr. 22). An EMG from April 2015 showed only "borderline bilateral carpal tunnel syndrome." (Tr. 21). A physical examination from June 2014 revealed "full range of motion and normal neurological examination." (Tr. 20). Treatment

notes from February 2014 showed "stable hand pain and stable hand paresthesias" as well as "normal strength in the upper extremities." (*Id.*). An August 2013 examination found "full range of motion" in bilateral muscles alongside "normal" deep tendon reflexes and sensory examination. (*Id.*). Further, "there [was] nothing in the medical evidence of record to support the claimant's testimony that she can only stand/walk for 5 minutes and that she has to use an electric cart for shopping." (Tr. 22). Although the ALJ did not explicitly say so, this evidence goes directly to the supportability of the opinion, as well as its consistency with the record as a whole. It strikes directly at the heart of what makes a medical opinion trustworthy—and consequently, what makes N.P. Holloway's opinion unreliable.

Pushing her proposition further, Dame points to "[o]bjective medical evidence" which "supports [N.P.] Holloway['s] and Dr. Giacalone's PRFC contained in Tr. 546-548," as well as Dr. Bhangu's opinion in the medical records. (*Id.* at 20, 23); (Tr. 500-01). She then wrestles with the ALJ's finding that the PRFC was internally inconsistent—it indicated the Dame could "lift 5 to 10 pounds, but only a maximum of 5 pounds," (Doc. 13 at 21-22)—suggesting that such a discrepancy is "arguably negligible and . . . not significant enough to render the same RFC invalid." (*Id.* at 21).

"As long as substantial evidence supports the Commissioner's decision, we must defer to it, 'even if there is substantial evidence in the record that would have supported the opposite conclusion.'" *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)) (internal quotation marks omitted). Indeed, the supposed "internal[] inconsisten[cy]" in this report as to the amount Dame could lift seems thin. But generously construing this language as error does

not warrant remand; as discussed, the ALJ's rationale for affording the opinion little weight finds support from substantial evidence in the record.

### 2.   The ALJ Did Not Make an Improper Credibility Determination

Dame also contests the ALJ's finding that she was only partially credible, citing error under SSR 96-7p, which requires that credibility determinations be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." (Doc. 13 at 22); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Her qualms are twofold: (1) that the ALJ based his credibility determination on his observation that Dame "exhibited no difficulty walking into and out of the hearing room," and (2) that the ALJ characterized Dame's carpal tunnel syndrome as "borderline." (Doc. 13 at 22). "[B]lanket assertions that [Dame] is not believable or cherry picking evidence will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." (*Id.* at 23).'

Unfortunately for Dame, the ALJ's analysis flows as it should under 96-7p. The ALJ first notes that objective medical evidence does not substantiate Dame's statements as to her symptoms' severity. (Tr. 22). Where an ALJ finds such a deficiency, 96-7p requires her to "make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ first noted that Dame seemed capable of walking into and out of the examination room and that a post-DLI EMG characterized Dame's carpal tunnel syndrome as

"borderline." (Tr. 22). But even if these considerations constitute analytical error—and as discussed, *infra*, they do not—the ALJ also cited: the consultative examiner's finding of "full grip strength and dexterity"; the lack of evidence that Dame sought treatment for "many other [alleged] conditions including diverticulitis, ulcers, asthma, and diabetes, mellitus"; and the tension in Dame's claims that she "stopped working in 2008 to care for her disabled husband" but "was going to quit working anyway due to her conditions." (Tr. 22-23).

This evidence collectively addresses a number of areas for consideration listed in 96-7p: It points to inconsistencies between Dame's testimony and the record evidence. SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996) ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). It shows a lack of medical evidence for various conditions. *Id.* at *6 ("When present, . . . findings [based on medical evidence] tend to lend credibility to an individual's allegations about pain or other symptoms and their functional effects."). It betrays a dearth of medical treatment history for various conditions. *Id.* at *7 ("[A] longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment . . . lends support to an individual's allegations . . . ."). And it addresses an observed capacity to maintain physical composure. *Id.* at *8 ("[The adjudicator] should consider any personal observations in the overall evaluation of the credibility of the individual's statements."). Altogether, the ALJ found that substantial evidence imperiled Dame's credibility. The "blanket assertions" and "cherry picking [of] evidence" Dame decries reveal themselves to be holistic analysis.

Whether the ALJ here fulfilled his duty or not would be a closer question had he rested his conclusion *solely* on his personal observation that Dame "exhibited no difficulty walking into and out of the hearing room," alongside characterizing her "carpal tunnel syndrome . . . as 'borderline.'" (Tr. 22). But, on the facts at hand, these considerations were proper. As to the former consideration: guiding law *encourages* ALJs to take their personal observations into consideration when possible. *See* 96-7p, 1996 WL 374186, at *8 (July 2, 1996) ("[T]he adjudicator is not free to accept or reject the individual's complaints *solely* on the basis of . . . personal observations, but *should consider* any personal observations in the overall evaluation of the credibility of the individual's statements." (emphasis added)).

As to the "borderline" language: the ALJ noted in his opinion an August 2012 EMG that revealed "mild median neuropathy consistent with carpal tunnel syndrome," (Tr. 20) as well as an April 2015 EMG that revealed "borderline bilateral carpal tunnel syndrome," (Tr. 21). He also characterized Dame's carpal tunnel syndrome as a severe impairment. (Tr. 17). Read in this context, the ALJ's passing mention of "borderline" carpel tunnel syndrome in his credibility analysis seems geared toward articulating that post-DLI evidence—together with the earlier EMG and other record evidence—suggests symptoms far less severe than those alleged. This inference is permissible. *See Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003) ("Post-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured." (citation omitted)); *Barnett v. Sec'y of Health & Human Servs.*, No. 86-3111, 1987 WL 36614, at *3 ("Of course, evidence of post-insured status . . . is not necessarily irrelevant to the issue

of claimant's . . . health on a prior date. To the extent that such evidence relates back to the period of insurance coverage, it should be considered by the secretary." (citation omitted); *see also Fucinari v. Comm'r of Soc. Sec.*, No. 12-cv-13308, 2013 WL 2393137, at *7 (E.D. Mich. May 31, 2013) ("[T]he Court did not find any post-DLI evidence that specifically indicated that Plaintiff was severely impaired during the relevant time."); *cf. Finney v. Colvin*, 637 F. App'x 711, 719 (4th Cir. 2016) ("Whatever event terminates the relevant period, the basic principle is the same: the relevance of a claimant's medical records turns not on when those records were created, but on whether they are probative of the claimant's condition during the relevant period."). Whittled down like so, Dame's frustration appears directed at the ALJ's semantic choices rather than his underlying reasoning. In any case, both were permissible, and neither warrant remand.

### 3. The ALJ Did Not Err in Finding Dame Capable of Performing Light Work as a Cashier

Dame contends the ALJ "failed to adequately consider [her] limitations using her bilateral upper extremities due to carpel tunnel syndrome." (Doc. 13 at 13-14). She correctly recites the VE's testimony that being a cashier requires "frequent . . . reaching, handling, fingering and feeling," and that someone able to perform such activities for two hours in an eight hour day would not pass muster. (*Id.* at 14); (Tr. 47). Because the ALJ only found Dame "limited in her ability to avoid concentrated exposure to vibration," the RFC determination "failed to incorporate sufficient limitations" with regard to using "the bilateral upper extremities, including less than frequent usage." (Doc. 13 at 14-15). Where

an ALJ "ignore[s] an entire line of evidence," Dame suggests, the error "warrants a remand." (*Id.* at 15).

Dame essentially pigeonholes complaints regarding the ALJ's credibility analyses into a separate claim that—as a result of the weight given to Dr. Giacalone's, N.P. Holloway's, and Dame's statements—the ALJ failed to accurately approximate the severity of Dame's carpal tunnel syndrome and produced a flawed RFC. As discussed at length, *supra*, substantial evidence undergirds the ALJ's findings. That he did not subscribe to Dame's position that she could not frequently handle, reach, finger, or feel with her bilateral extremities does not delineate an error in his analysis. *See, e.g.*, *Burke v. Comm'r of Soc. Sec.*, No. 1:15-cv-83, 2016 WL 1156596, at *2, *5 (W.D. Mich. Mar. 24, 2016) (upholding a similar RFC that found a claimant with carpal tunnel syndrome capable of performing the job of "cashier" as outlined in the DOT); *Baker v. Comm'r of Soc. Sec.*, No. 12-cv-14530, 2013 WL 6409955, at *9 (E.D. Mich. Dec. 9, 2013) (same); *cf. Davis-Grimplin v. Comm'r, Soc. Sec. Admin.*, 556 F. App'x 858, 863 (11th Cir. 2014) ("The ALJ had ample evidence on which to conclude that Davis did not have functional limitations of her hands notwithstanding that her bilateral carpal tunnel syndrome is a severe impairment."). Likewise, he was free to omit Dame's alleged manipulative limitations from his questions to the VE. *Accord Davis-Grimplin*, 556 F. App'x at 863 ("The ALJ had ample evidence on which to conclude that Davis did not have functional limitations of her hands notwithstanding that her bilateral carpal tunnel syndrome is a severe impairment. He was therefore not required to include a hand limitation in the hypothetical posed to the VE."); *Moore v. Comm'r of Soc. Sec.*, 500 F. App'x 638, 640 (9th Cir. 2012) (finding the ALJ

"not required to address [manipulative] limitations [resulting from CTS] for which there was no record support. . . . in his hypothetical questions" to the VE). The ALJ's RFC determination features no error, and does not warrant remand.


### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Dame's Motion for Summary Judgment (Doc. 13) be **DENIED**, the Commissioner's Motion (Doc. 14) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 18, 2016

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 18, 2016

By s/Kristen Castaneda
Case Manager